**DAVIS, Federal Agent of Railroads, v. WYSKUP.**

No. 12330—Opinion Filed Nov. 20, 1923.

Rehearing Denied Feb. 19, 1924.

1. **Railroads—Killing Animals on Tracks—Liability.**

Under circumstances such as those involved in this case, it is a well settled rule that the only duty resting upon a railroad company is to use ordinary care to prevent injury to trespassing animals, after the discovery of their presence and position of danger.

2. **Trial—Directing Verdict—Denial of Motion.**

The jury are the sole judges of the credibility of the witnesses and the weight of the evidence, and where positive evidence has been introduced to prove a certain state of facts, and no evidence has been introduced to rebut the same, but where said evidence is inherently improbable, or the physical facts and circumstances surrounding the case tend to contradict such evidence, and the testimony, when taken together with the physical facts and circumstances surrounding the case, is of such a nature that men of ordinary intelligence might draw different conclusions therefrom, it is not error for the court to overrule a motion to instruct a verdict.

3. **Evidence — Weight — Testimony Improbable Though Uncontradicted.**

The rule undoubtedly is that where the positive testimony of a witness is uncontradicted and unimpeached, whether by other positive testimony of by circumstantial evidence, either intrinsic or extrinsic, it cannot be disregarded, but must control the decision of the court or jury. But a witness may be contradicted by the facts he states as completely as by direct adverse testimony. A court or jury is not bound to accept it as true merely because there is no direct testimony contradicting it, where it contains inherent improbabilities or contradictions, which alone, or in connection with other circumstances in evidence, satisfy them of its falsity.

4. **Affirmance of Judgment.**

Record examined, and held, the case was properly submitted to the jury under proper instruction applicable to the cause, and the evidence is sufficient to support said verdict.

(Syllabus by Pinkham, C.)

Commissioners' Opinion, Division No. 5.

Error from District Court, Oklahoma County; James I. Phelps, Judge.

Action by Ike Wyskup against James C. Davis, United States Agent. Judgment for plaintiff, and defendant brings error. Affirmed.

C. O. Blake, W. F. Collins, W. R. Bleakmore, and A. T. Boys, for plaintiff in error.

Jno. H. Wright and Clarence J. Blinn, for defendant in error.

Opinion by PINKHAM, C. This proceeding in error is brought by James C. Davis, agent provided for in the Transportation Act of 1920, to obtain review of proceed-

ings in the district court of Oklahoma county, Okla:, in a certain action commenced in that court by the defendant in error, as plaintiff, against John Barton Payne, as Director General, in charge of and operating the railroads of the Chicago, Rock Island & Pacific Railway Company, to recover damages sustained on account of alleged negligence of the agents and servants of the Director General, in running over, killing, and injuring certain horses and mules belonging to the plaintiff on the morning of November 5, 1919, near Harrah, Okla.

The parties will be referred to as they appeared in the trial court.

The cause proceeded to judgment against John Barton Payne, as agent provided for in the federal Transportation Act, U. S. Compiled Stat. 10071¼ c, and thereafter, on April 12, 1921, upon his motion, said James C. Davis, Director General of Railroads, as agent was substituted as the defendant herein. From a judgment in favor of the plaintiff in the sum of $1,230, the defendant has appealed, and for a reversal of said judgment relies upon three specifications of error, which are as follows: First, The court erred in refusing to sustain defendant's demurrer to the evidence; second, the court erred in overruling the defendant's motion for a directed verdict; third, that the verdict of the jury is contrary to law.

These three specifications of error are discussed in the defendant's brief under the proposition that the evidence was insufficient in law to constitute a cause of action in favor of the plaintiff and against the defendant. and there is no evidence to support the verdict.

The plaintiff alleged in his petition that on November 5, 1919. he was the owner of certain horses and mules; that on said date at about 2:30 a. m., said animals were, unknown to plaintiff and without any negligence on his part, on the railroad track of the defendant at a point about one mile east of the town of Harrah, and about 500 yards west of a certain trestle; that the track of the defendant's railroad is a straight track and the view thereon uninterrupted and unobstructed for a distance of about 500 yards west of said trestle. That on said date and at said time and at the trestle mentioned all of said animals except a certain mare, were killed, and the said mare was so badly crippled as to be rendered wholly worthless by an eastbound passenger train. operated and controlled by defendant, running from Oklahoma City, through said town of Harrah, and to Shawnee, Okla., in the following manner:

That the engineer and fireman operating the engine of said train first discovered, or should have, with the exercise of ordinary care, discovered the presence and peril of said animals on said track at the point referred to, and when said train was at a distance west of said point sufficient to have enabled them to have stopped said train. or to have prevented said killing and injuring said animals; that after discovering, or being able with the exercise of ordinary care to discover, the presence and peril of said animals on said track at said point, said engineer and fireman failed to exercise reasonable care in the management of said train to avoid killing or injuring said animals: but on the contrary, negligently and carelessly managed, operated and ran said train at a rapid rate, but at a speed unknown to plaintiff, a distance of approximately 500 yards after and following said fleeing animals, negligently and carelessly and wantonly chasing, following, and running said animals down said track a distance of approximately 500 yards until said fleeing animals reached a wooden trestle on said tract, where said train forced and caused said animals to run on said trestle, which they were unable to cross, and where said train ran into said animals, killing all of them except said mare, and injuring said mare as stated above.

The answer of defendant was a general denial. Upon the issues thus joined, the cause proceeded to trial

The undisputed facts are, as disclosed by the record, that certain horses and mules owned by plaintiff escaped from plaintiff's enclosure. without any fault or negligence of plaintiff, through a gate opening into defendant's right of way. On the morning of November 5, 1919, the plaintiff discovered the absence of the stock and with two other persons found their tracks leading from the plaintiff's field through an open gate into the right of way of the defendant's railroad. Plaintiff and his witnesses testified that they examined the tracks of the said animals and that by their appearance the animals had walked from this gate to another gate some distance away and went into a corn field. It appears that both of these gates were used in connection with private crossings. Plaintiff and his witnesses testified that the horses ran from gate opening into the corn field down the right of way and on both sides of the rails, and that at the west approach of the trestle, or bridge, all of the animals appear to have got onto the track; and all of the animals which were killed and injured were found just east of the bridge.

One of the plaintiff's witnesses testified that the distance from where the animals started to run to the bridge is 700 yards: at about 500 yards the track curves: that from this curve you can see the bridge for about 200 yards. This witness testified:

"From that place where these horses started to run, you could see this bridge from the grade from there, and you could see the track * * * for about 200 yards the track is about level, and is straight."

That the distance the horses ran was about 14 telegraph poles. Another witness testified that he followed the tracks from where the horses started to run and across the bridge, that he saw the dirt dug out between the railroad track and the side of the track for about 500 yards: that the horses kept right on down the railroad track to and across the bridge, and on cross-examination, that the horses got out of plaintiff's field, walked along the railroad track, entered a neighbor's field, made a little circle and came back on to the railroad track, at which point they started to run; that they ran from that point down the railroad track and on to the trestle or bridge; and that he could tell they were running from the manner in which the dirt was dug out for a distance of about 500 yards. The plaintiff testified that when he came home that night he closed the gate behind him, and turned the horses out into a field; that the tracks on the railroad indicated that the horses had been running from the point where they left the neighbor's field; that they ran a distance of about 14 or 15 telegraph poles, or a distance of about 500 or 600 yards; and on cross-examination, that the horses didn't commence to run until they had come out of the neighbor's field; that they must have been running all the way from the corn field to the trestle or bridge because there were big holes dug out with their feet; and that there were no obstructions to the view for said distance of 500 or 600 yards.

The engineer of the train was the only witness to the accident. He testified that he was 48 years old; that he had been an engineer 24 years; that he remembered about hitting the stock at a little bridge just east of the town of Harrah November 5, 1919; that the train he was pulling was a passenger train running from El Reno to McAlester; that he was going east when he struck the stock; that the country where the animals were struck is about level; that the track curves about 500 feet west of the said bridge where the animals were struck; that the track curves north toward the river; that at the time he discovered the stock he was running 40 miles an hour; that the engine and train was in good running order; that he had made a test at El Reno, and also at Oklahoma City. That he was about 200 feet from the stock when he first discovered them; that they were running towards the engine; "they run right up to the east approach of the bridge and they stopped there, and he ran into them just like running into the dark:" that when he first saw the horses they were in the middle of the track, coming towards the engine. That he was about 200 feet from the bridge. That he applied the air and the emergency, and did everything he could to stop the train as soon as possible; that he was not able to stop the train in that distance before striking the stock; that the train was brought to a stop about 50 or 60 feet after striking the animals; that his train was about 375 or 380 feet long; that it was a dark, foggy night, and the rail slippery; no moon was shining. That at the time of the collision it was 2:27 or 2:28 a. m.

He was asked:

Q. "Now, about this, tell in your own words to the jury what happened when you saw these horses and where they were and where you were and what you did?" A.— "Well, as near as I can judge, why, I was —was about two hundred feet (200) from the stock when I first discovered them and they was evidently playing or else was scared; they had been on the south side or, on the north side of the track; they was running towards the engine; they run right up to the east approach of the bridge and then, they stopped right there and I run into them, just like running into the dark: well, one (1) of them fell on the north side and one (1) on the south side and one (1) caught under my pilot and drug there until the train was stopped and one (1) got up over the pilot on the right side, over the steam chest and fell off and this one that was under the pilot was dragged until we stopped; we had to jack up the pilot for this one and there was a soldier on the train and he came there and he shot the horse before we could get it off the track." Q. "Now, where were the horses when you first saw them on the track there with reference to being to the bridge?" A. "They was in the middle of the track coming towards me." Q. "Coming towards you?" A. "Yes." Q. "Then, about how far were you from the bridge?" A. "I should judge about two hundred feet (200')." Q. "What did you do, if anything, when you first saw this stock on the track?" A. "I applied the air and the emergency.'

Q. "Well, you did everything to stop the train?" A. "As soon as possible, yes." Q. "To make the emergency stop? Were you able to stop the train in that distance there before striking the stock?" A. "No."

The engineer further testified that his engine was equipped with regulation headlight and at the time of the collision and before it was in its usual condition, burning as usual.

The fireman testified that he did not see the stock before it was struck, that he was putting coal in the fire box.

At the conclusion of the evidence defendant moved a directed verdict, which motion was by the court overruled and the defendant excepted. The court then instructed the jury:

"You are hereby instructed if you find and believe from a preponderance of the evidence that the animals of plaintiff were killed and injured, as alleged in plaintiff's petition, through the negligence of the employes of defendant in the operation of its railroad train, then your verdict should be for the plaintiff in such sum or amount as the evidence shows the plaintiff has sustained in damages: that in this connection, you are instructed that under the evidence in this case, the animals were trespassing upon the right of way of defendant and the employes of the defendant were not required to look out for them but were only required to exercise ordinary care after their presence and peril upon the track was discovered to prevent injuring or killing them; and if you find and believe from the evidence in this case that the defendant used ordinary care to prevent injury to the animals in question after their presence and peril upon the track of defendant was discovered, then, defendant would not be liable for injury to such animals; but upon the other hand, if you should find and believe from the evidence that after the animals were discovered upon the track of the defendant, the defendant through its employes did not use ordinary care to prevent the injury to such animals, then, your verdict should be for the plaintiff and by ordinary care is meant that degree of care which an ordinarily prudent person would have used under the same or similar circumstances."

It is contended by the defendant that there is an entire lack of evidence to support the theory that these animals were killed by the negligence of the defendant; that on the contrary the record discloses positively that there was no negligence.

The rule announced in many decisions of this court as to the duty of a railroad to trespassing animals is that the only duty resting upon it is to use ordinary care to prevent injury to the animals after the discovery of their presence and position of danger. Ft. Smith & W. R. Co. v. Dixon, 52 Okla. 722, 152 Pac. 350.

The burden of proof to establish the acts of negligence rests upon the plaintiff; the accident itself raising no presumption of negligence. Midland Valley Ry. Co. v. Bryant, 37 Okla. 206, 131 Pac. 678.

In the case of Chicago, R. I. & P. Ry. Co. v. Owens, 78 Okla. 114, 189 Pac. 171, it is said:

"The general rule is, where the testimony is positive upon a certain state of facts, the jury cannot capriciously disregard the same. The exception to the rule is, where the physical facts and the circumstances surrounding the transaction tend to contradict the positive testimony, or the positive testimony is inherently improbable, then, it becomes a question for the jury. * * *"

Tested by all these well-established rules, the question arises: Was there any evidence tending to prove negligence? Or any circumstances from which negligence might be inferred?

The physical facts and circumstances surrounding this case contradict in a number of particulars the positive testimony of the engineer, that these horses were coming toward the engine when he ran them down. The direction taken by the animals shown by their tracks as testified to by plaintiff's witness was in direct conflict with the testimony of the engineer. If plaintiff's witnesses are to be believed the horses had been running hundreds of yards in advance of the engine; they had crossed the bridge and were overtaken at the east approach of the same and there killed and injured; that they were not running toward the engine, but were fleeing from it. We think it was a question for the jury to say whether the testimony of the engineer of the locomotive, which killed the animals was reasonable, consistent, and uncontradicted. Kansas City So. Ry. Co. v. Whitely (Ark.) 213 S. W. 369; St. Louis, I. M. & S. Ry. Co. v. Chambliss, 54 Ark. 214, 15 S. W. 469.

The track, it appears, was straight for a considerable distance west of the bridge, and if the testimony of plaintiff's witnesses was believed the engineer could not have kept from seeing these animals sooner than he testified to have seen them, and could therefore have avoided crashing into them.

It does not follow that because the engineer was not directly contradicted by another witness that his testimony is un-

disputed. His manner on the stand, the improbability of his version of what occurred, its self-contradiction, the evidence afforded by circumstances, all these things or some of them may rightly lead the jury to reject his testimony. Smucker v. Penn. R. Co., 6 Penn. Sup. Ct. 529.

There are many cases illustrating the principle that the testimony of a witness though uncontradicted is for the triers of facts, whether court or jury, who are not bound thereby.

A typical illustration of the "double rule" may be found in Gorman v. Hand Brewing Co., 28 R. I. 180, 66 Atl. 209, when the court in sustaining the jury who evidently disbelieved one of the defendant's witnesses, said:

"We have found no better statement of the principle under consideration than is made by Mitchell. J., in Anderson v. Lilljengren, 50 Minn. 3, 52 N. W. 219. He says: 'The rule undoubtedly is that where the positive testimony of a witness is uncontradicted and unimpeached, whether by other positive testimony or by circumstantial evidence, either intrinsic or extrinsic, it cannot be disregarded, but must control the decision of the court or jury. But a witness may be contradicted by the facts he states as completely as by direct adverse testimony. A court or jury is not bound to accept it as true merely because there is no direct testimony contradicting it, where it contains inherent improbabilities or contradictions which alone, or in connection with other circumstances in evidence, satisfy them of its falsity.'"

"Where the witness's own statements create an impression of the improbability of the facts to which he testifies, his evidence may be discredited." Beatty v. Beatty, 151 Ky. 547, 152 S. W. 540.

It is true the engineer testified positively that he did not discover the horses until within 200 feet of them, and that they were running toward the engine, but we are unwilling to say that even this unqualified statement might not be discredited by the jury, if they believed from the evidence that surrounding circumstances and conditions made its truthfulness improbable.

The jury is not absolutely bound by the testimony of a witness, although it is not contradicted by direct evidence, when the evidence itself indicates that it is unworthy of belief. Kennedy v. Modern Woodmen, 243 Ill. 560, 90 N. E. 1084.

In the case of Lighthouse v. C., M. & St. P. Ry. Co., 3 S. D. 518, 54 N. W. 320, it is said:

"It is true the engineer and others upon the engine testified positively that they did not discover the horses until within 30 or 40 feet of them; but we are unwilling to say that even this unqualified statement might not be discredited by the jury, if they believed from the evidence that surrounding circumstances and conditions made its truthfulness improbable."

If after the presence and peril of these animals was first discovered they were warned by the ringing of the bell, blowing the whistle, dimming or extinguishing the headlight, there is no evidence in this record showing such fact.

It is true that in the case of M., K. & T. Ry. Co. v. Raines, 59 Okla. 52, 158 Pac. 936, cited by defendant, while the engineer testified that he "sounded the whistle and the bell was rung by the air bell ringer for the crossing," the court held that:

"If the defendant owed no duty to the owner of trespassing animals, other than to use ordinary care to prevent injury after it had discovered the animals, then it follows that a failure to ring the bell or blow the whistle would not render it liable."

That was a case, however, where the negligence complained of consisted in failing to ring the bell or blow the whistle for a crossing and before the animals were discovered.

Whether the whistle was sounded, the bell rung, or any other means resorted to by the engineer to warn these animals was peculiarly within the knowledge of the defendant.

The trial court saw and heard the witnesses in this case, and was in a position to judge of their candor and fairness, and has refused to disturb the verdict for any of the reasons urged before us.

After a careful examination of the record, we think we should not be warranted in setting the verdict aside.

For the reasons stated, we think the judgment should be affirmed.

By the Court: It is so ordered.